# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 24-0566V**

CYNTHIA REYES,

Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent.

Chief Special Master Corcoran

Filed: September 2, 2026

*Paul R. Brazil, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Lauren Kells, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT[1]

On April 11, 2024, Cynthia Reyes filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that that she suffered a shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine received on November 3, 2021. Petition at 1.

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I find the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Respondent contested Petitioner's entitlement to compensation (ECF No. 13), and the parties have now briefed entitlement (ECF Nos. 16, 21). For the reasons set forth below, I find that the evidence of record preponderantly establishes that Petitioner likely suffered from residual effects of her condition for more than six months; that her shoulder pain likely began within 48 hours of vaccination; and that she has preponderantly satisfied the remaining Table SIRVA elements and other statutory requirements. She is therefore entitled to compensation.

## I. Relevant Factual History

### A. Medical Records

Petitioner received a flu vaccine in her left shoulder on November 3, 2021. Ex. 1 at 2. Nearly three weeks later (November 22, 2021), Petitioner saw a primary care physician ("PCP") to establish care. Ex. 4 at 10. A musculoskeletal examination noted no limitations on rising from a seated position or ambulation, but did not address her upper extremities. *Id*. at 12. The record of this visit includes discussion of chronic health conditions and screening tests for other conditions, but does not mention Petitioner's left shoulder. *Id*. at 8-29.

On December 14, 2021 (now five weeks after vaccination), Petitioner was seen in urgent care, reporting "[u]pper left arm pain weakness and limited range of motion [that] has been increasing for more than a month since flu shot." Ex. 3 at 8. Petitioner reported that she had seen her PCP and started using warm compresses, but her left arm weakness was getting progressively worse. *Id*. She described an "[e]lectric sharp pain with tightness to deltoid/bicep area of left arm." *Id*. Petitioner was assessed with left upper arm pain and strain of the muscle, fascia, and long head biceps tendon of her left arm, given anti-inflammatory medication, and referred to physical therapy ("PT").

Petitioner underwent a PT evaluation a week later (December 21, 2021). She reported left shoulder pain that "started on 11/9/21 after having a flu shot in her arm." Ex. 6 at 6. She added that she had "typical post-injection pain initially, but pain increased over the next week." *Id*. She rated her pain three out of ten, ranging from two at best to eight at worst. *Id*. She attended a total of five PT sessions between December 21, 2021 and February 8, 2022. Ex. 3 at 6-41. At discharge on February 8th, she exhibited limited internal rotation and pain that disturbed her sleep. *Id*. at 40. The therapist noted that she had made "limited progress" in PT, and continued to experience significant pain that affected her sleep and ability to do home and self-care activities. *Id*. at 41. The therapist recommended that Petitioner seek further evaluation from her PCP or a shoulder specialist. *Id*.

The next day (February 9, 2022), Petitioner messaged her PCP, stating that she "mentioned some persistent arm pain I continued to have after my flu shot which turned

into reduced range of motion." Ex. 5 at 17. Although ambiguous, this reference appears to suggest that Petitioner had mentioned her shoulder pain to her PCP at her prior appointment in November 2021. Petitioner informed her PCP that she had gone to urgent care in December, followed by eight weeks of PT, with no improvement. *Id*. Her PCP suggested that they discuss imaging options at Petitioner's next appointment. *Id*.

On February 28, 2022, Petitioner saw her PCP for a follow up appointment. Ex. 7 at 53. She noted that she had received a flu vaccine in November, and "developed pain and decreased range of motion over the subsequent 2 weeks." *Id*. On examination, her left shoulder exhibited "[d]ecreased active range of motion to 90 degrees in left shoulder abduction," and her PCP located a palpable rubbery nodule in her left inferior deltoid. *Id*. Petitioner was assessed with a SIRVA and referred to a sports medicine specialist. *Id*. at 54.

On March 7, 2022, Petitioner consulted a sports medicine specialist for evaluation of left shoulder pain following vaccination in November 2021. Ex. 7 at 38. Petitioner explained that after vaccination, she had typical postinjection soreness that persisted beyond the usual couple of days. *Id*. She felt it had gotten progressively worse with time, and that it started to restrict her motion. *Id*. She had done PT with "marginal benefit." *Id*. She described her pain as "significant at night," preventing sleep. *Id*. at 39. On examination, her left shoulder range of motion ("ROM") was "substantially limited." Her active ROM in abduction and flexion was 45 degrees; passively, her ROM was 60 degrees in abduction. *Id*. An ultrasound was "very limited" because her ROM restrictions prevented the physician from being able to rotate her shoulder to the optimal position to see her rotator cuff. *Id*. Petitioner was assessed with adhesive capsulitis, and given medication and a PT referral. *Id*. She returned a few days later for an ultrasound-guided steroid injection. *Id*. at 27.

On April 13, 2022, Petitioner messaged the specialist, stating that she continued to experience cramping pain in her upper arm with certain movements. Ex. 7 at 25. Her doctor responded that further imaging would likely not provide more useful information, but that there was another type of injection he could try. *Id*. However, he cautioned that frozen shoulder "can take a very long time to improve (many months)." *Id*.

Thereafter, Petitioner did not seek further treatment of her shoulder for a year. During that gap, she messaged her PCP for unrelated matters several times, without mentioning shoulder pain. Ex. 7 at 14, 16; Ex. 15 at 14, 19. Also during the one-year gap, Petitioner moved to Arizona (where she had previously lived), and on December 13, 2022, Petitioner saw her prior PCP to re-establish care. Ex. 2 at 27-28. She underwent an annual examination with her PCP on February 13, 2023. *Id*. at 23. Shoulder pain was not documented in either of these records.

On April 7, 2023 (hence a year since her last shoulder-specific medical encounter), Petitioner saw an orthopedist for evaluation of left shoulder pain since after the November

3, 2021 vaccination. Ex. 8 at 32, 34. She now rated her pain four out of ten, stating it was worse at night. *Id*. On examination, her left shoulder passive ROM in forward flexion was 105 degrees, compared to 140 degrees on the right. *Id*. She was assessed with left shoulder adhesive capsulitis, osteoarthritis, and rotator cuff tear, and an MRI was ordered. *Id*. at 33. An MRI showed an intact rotator cuff, labrum, and biceps tendon, with mild degenerative acromioclavicular arthritis and no significant glenohumeral joint effusion. *Id*. at 102.

Petitioner saw her orthopedist to review the MRI results on May 31, 2023. Ex. 8 at 28. She reported cramping pain in her left shoulder that she had treated with formal PT and a steroid injection in the beginning of 2022, without relief, and now sought additional treatment options. *Id*. On examination, her left shoulder active ROM was 90 degrees in forward flexion and ten degrees in internal rotation, and her passive ROM was five degrees in external rotation. *Id*. Petitioner was assessed with adhesive capsulitis, and surgical and non-surgical treatment options were discussed. *Id*. at 29. She was given a PT referral. *Id*.

On July 3, 2023, Petitioner returned to her orthopedist, reporting continued pain. Ex. 8 at 24. She underwent an ultrasound-guided steroid injection, which she reported resulted in 80% symptomatic improvement before she left the office. *Id*. On the same day, Petitioner attended a PT evaluation of her left shoulder. *Id*. at 97. The visit was focused on manual treatment to improve her passive ROM to optimize the results of the steroid injection she had just received. *Id*. at 98. Petitioner attended a total of five PT sessions between July 3 and July 25, 2023. *Id*. at 85-98.

Petitioner consulted her orthopedist on August 4, 2023. Ex. 8 at 20. She reported mild improvement in pain and ROM after the steroid injection she received at her prior visit. *Id*. However, she felt that her progress had stagnated, and decided to proceed with surgery. *Id*. at 20-21.

On September 13, 2023, Petitioner underwent a left shoulder diagnostic and operative arthroscopy of the left shoulder and left shoulder capsular release with extensive synovectomy. Ex. 8 at 99. Her pre- and post-operative diagnoses were left shoulder adhesive capsulitis and synovitis. *Id*. Under anesthesia at the beginning of the procedure, her left shoulder exhibited restricted passive ROM in all directions. *Id*. at 100. Following capsular release and synovectomy (but while still under anesthesia), her shoulder exhibited full and unrestricted passive ROM. *Id*.

Petitioner attended a post-operative PT evaluation two days after surgery (September 15, 2023). Ex. 8 at 81. She described constant pain that she rated as ranging between one and five out of ten. *Id*. The record of this evaluation states that Petitioner reported a history of left shoulder adhesive capsulitis since 2019 – two years before vaccination – which I interpret as a likely typographical error in light of the lack of any other records documenting pre-vaccination left shoulder concerns. *Id*. On examination,

Petitioner's left shoulder passive ROM was 65 degrees in flexion and 55 degrees in abduction. *Id*. at 82. Petitioner attended a total of 16 post-operative PT sessions between September 15 and December 21, 2023. *Id*. at 37-84. At her final session on December 21st, she reporting feeling better every day and was "making great improvements in her passive and active mobility." *Id*. at 37-38.

Petitioner attended her final post-operative orthopedic appointment on January 19, 2024. Ex. 8 at 5. She was happy with the outcome of her surgery, reporting continued overall improvement, with only "very minimal discomfort." *Id*. Her left shoulder active ROM was 130 degrees in flexion and 50 degrees in external rotation. *Id*. She was advised to follow up as needed and to continue home exercises to further improve her ROM. *Id*. at 6.

### B. Testimonial and Other Evidence

Petitioner filed two declarations in support of her claim. Exs. 9, 17. She states that she felt pain "right away" after vaccination. Ex. 17 at ¶ 1. During the year that she did not report symptoms or seek treatment, her symptoms did not improve; she "simply could not undertake a surgery and recovery due to [her] work obligations." *Id*. at ¶ 3. She explains that during this time, she traveled to Arizona frequently, and ultimately relocated there. *Id*. Once she was settled in, she found a doctor to resume care and perform surgery. *Id*.

Petitioner also filed screenshots of text messages. Ex. 16. Nearly all of the messages appear to have been found through a search for the word "arm," and thus only messages containing that word appear; the surrounding conversations are not included. In a message dated November 14, 2021, 11 days after vaccination, Petitioner told a colleague that her "arm still hurts from flu shot when I move it certain ways." *Id*. at 2. A month later (December 14, 2021), Petitioner told the same colleague that she was taking a sick day because she "[h]ad bad night of this stupid arm pain. From stupid flu shot." *Id*. at 1. Her colleague recommended that she have her arm examined. *Id*.

In a May 22, 2022 text message, Petitioner stated that she had taken gabapentin for her arm. Ex. 16 at 22. On July 10, 2022, Petitioner reported that her "arm [had] been hurting a lot." *Id*. at 8. On August 4, 2022, Petitioner texted that she had just arrived at a hotel and her "arm started hurting a lot at dinner." *Id*. at 14. On December 1, 2022, she texted that her "arm [was] really hurting today." *Id*. at 16. On March 4, 2023, she jokingly offered to help a friend paint, stating that she had "one good arm [she could] paint with." *Id*. at 18. On March 22, 2023, she stated that her arm was "hurting a bit today" and she had taken Aleve. *Id*. at 18.

## II. The Parties' Arguments

Petitioner asserts that it is "not at all unusual for people not to seek immediate medical care for an injury consistent with SIRVA." Petitioner's Brief, filed April 14, 2025, at *7 (ECF No. 16) ("Br."). On numerous occasions, she related the onset of her pain to vaccination, reporting pain "since flu shot" or "after a flu shot." Br. at *7 (citing Ex. 3 at 8; Ex. 6 at 6). Her intervening visit with her PCP in November 2021 is an "innocuous omission" in such reporting. *Id*. at 8. Petitioner notes that she later told providers that she had been advised to treat her injury with hot and cold compresses during this visit, suggesting that her shoulder was discussed "at least in passing" during this visit. *Id*.

Concerning severity, Petitioner asserts that her symptoms persisted well beyond six months, relying on numerous text messages sent between May 22, 2022 and March 22, 2023. Br. at *9. These messages, in conjunction with the medical records, demonstrate that her pain persisted for over two years. *Id*. at *9-10.

Respondent contends that the medical records document residual effects for only five months and ten days. Respondent's Rule 4 Report, filed Dec. 20, 2024, at *9 (ECF No. 13) ("Rule 4 Report"). Petitioner last reported ongoing symptoms to a treater on April 13, 2022, when she messaged her orthopedist. Rule 4 Report at *9. Petitioner did not follow up on her doctor's treatment recommendation, or make any complaints of shoulder pain to a healthcare provider thereafter for a year. *Id*.

Respondent maintains that Petitioner has not established that the left shoulder symptoms she reported in April 2023 are vaccine-related. Rule 4 Report at *9. During the one-year gap, she attended three in-person consultations and engaged in four email conversations, none of which mention shoulder pain. *Id*. Respondent correctly asserts that Petitioner's text messages (Exhibit 16) "are not certified or authenticated and cannot be characterized as sworn testimony." Respondent's Response, filed June 27, 2025, at *3 (ECF No. 21) ("Resp."). Even assuming that the messages are authentic, Respondent asserts that the messages lack context because they are "isolated from the conversation in which they were generated" and thus deserve little to no weight. Resp. at *3.

Respondent also takes issue with Petitioner's supplemental declaration (Exhibit 17), pointing out that it was generated for purposes of litigation nearly two and a half years after vaccination. Resp. at *3. And Petitioner's explanation that her symptoms did not improve between April 2022 and April 2023, but that her work and travel schedule precluded further treatment is not consistent with her numerous visits and emails with medical providers during that time period that are silent on shoulder pain. *Id*. at *4. Furthermore, Petitioner has not offered documentation substantiating her work-related responsibilities and travel schedule. *Id*.

Concerning onset, Respondent argues that Petitioner has not demonstrated that her shoulder pain began within 48 hours of vaccination. Rule 4 Report at *10. Petitioner

saw her PCP 19 days post-vaccination, and the record of that visit does not mention shoulder pain or abnormal examination findings. *Id*.; Resp. at *5.

## III. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[3] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

Section 11(c)(1)(D).

"[T]he fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs*., No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where the petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs*., No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where petitioner did not seek additional treatment after the five-month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the

> underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

## IV. Ruling on Entitlement

### A. Severity Requirement

The record in its entirety supports the conclusion that Petitioner's right shoulder pain likely persisted for more than six months post-vaccination. Petitioner consistently sought care until March 2022 - four months after the onset of her shoulder pain - at which time she received a steroid injection. A month later – now over five months after the onset of her condition – she messaged her doctor, stating that she continued to experience pain with certain movements. He offered a different type of steroid injection, but Petitioner did not return to his office.

Thereafter, Petitioner continued to consult providers for other matters, but did not again report shoulder pain to a treater for a year. After the year-long gap, during which she moved to a different state, she saw a new specialist for left shoulder pain that she stated had been present since the November 2021 vaccination. Ex. 8 at 32, 34. Thereafter, Petitioner again attempted conservative treatment, including another steroid injection and PT. When those efforts were not successful, she underwent surgery.

The medical records, corroborated by testimonial and other evidence, support a finding that Petitioner's shoulder pain likely did not resolve during her year-long treatment gap. At both the beginning and end of the gap, Petitioner reported shoulder pain and reduced ROM. When she returned to treatment, she consistently related her pain to the November 2021 vaccination, describing pain since that time. (Petitioner's uncertified and unauthenticated text messages are consistent with the medical records that otherwise suggest that her symptoms persisted during the gap, although I accord them less weight overall).

Petitioner's lengthy treatment gap does bear on damages, suggesting that she experienced a prolonged period of significant pain relief, possibly resulting from the March 2022 steroid injection, or that her injury was mild enough to cease treatment for a long period (and it may even call into question whether treatment after the gap is still SIRVA-associated). But it does not in this case prevent a favorable severity finding.

**B. Onset**

The record supports the conclusion that Petitioner likely experienced the onset of shoulder pain within 48 hours of vaccination. Petitioner sought care just over five weeks after vaccination, reporting pain for more than a month "since flu shot." Ex. 3 at 8. Although the record of her intervening PCP appointment on November 22, 2021 does not indicate that she reported shoulder pain, she told the urgent care provider that after she saw her PCP she began using warm compresses – suggesting that Petitioner, while contemporaneously seeking care for her injury, reported that she had sought care from her PCP and the recommended treatment had not been helpful. Petitioner's February 2022 message to her PCP referring to a prior "mention [of] persistent arm pain . . . after my flu shot" (Ex. 5 at 17) also suggests that Petitioner reported her shoulder pain at the November 2021 appointment:

Although Petitioner told her physical therapist in December 2021 that her pain started on November *9*, 2021 – six days after vaccination – she also described her pain as beginning *following* vaccination, explaining that she initially experienced typical post-injection pain that worsened over the following week. Ex. 6 at 6. I find that the reference to November 9th is more likely a typographical error or misremembering of the date of vaccination, and does not suggest that the onset of her pain began six days after vaccination.

The remaining records consistently support that Petitioner reported pain beginning soon after vaccination. And no other records suggest otherwise.

### C. Factual Findings Regarding QAI Criteria for Table SIRVA and Other Entitlement Requirements

Respondent does not contest the remaining SIRVA Table elements and statutory requirements, and I find that they are preponderantly satisfied. Petitioner experienced limited shoulder ROM, and her symptoms were limited to her shoulder. Ex. 7 at 38, 53. The record does not contain preponderant evidence that she had a history of pain, inflammation, dysfunction, or another condition, that would explain her post-vaccination symptoms. Exs. 2, 10, 12, 13. Petitioner received a covered vaccine in the United States. Ex. 1 at 2. And she states that she has not received compensation an award or settlement for her vaccine-related injuries, nor has she filed a civil action. Ex. 9 at ¶ . Thus, Petitioner is entitled to compensation.

### D. Damages

The parties were previously directed to brief entitlement and damages (ECF No. 14). Petitioner did so, and seeks a pain and suffering award of $160,000.00. Br. at *10-13. Respondent, however, asserted that damages briefing was premature. Resp. at *6-8. Respondent instead proposed that if Petitioner were found entitled to compensation, Respondent would submit a proffer for Petitioner's consideration; if Petitioner were to reject it, the parties could then brief damages. *Id*. at *6.

The serial briefing Respondent acknowledges may result from bifurcating entitlement determinations from damages is precisely what I sought to avoid by directing the parties to brief *all* issues. Respondent correctly notes that reasoned entitlement rulings sometimes include information relevant to damages, pointing out that this could be especially helpful in this case, given the dispute as to the duration of Petitioner's injury and whether her symptoms and treatment after the year-long gap are vaccine-related. But given the prevalence of SIRVA claims in the Vaccine Program, and the extent to which they generally present the same kinds of disputes over and over again (with the reaction of the special masters to common objections well documented in rulings and decisions by now), the benefit of briefing both matters at once (when a special master sees the utility of so doing) usually outweighs the disadvantages.

I will allow the parties a brief time period to attempt to resolve damages informally. If those efforts are not successful within the next two months, Respondent will be ordered to file a damages brief.

## Conclusion

Based on my review of the record as a whole, I find that it is more likely than not that Petitioner experienced residual effects of her vaccine-related injury for more than six months and that the onset of her shoulder pain likely occurred within 48 hours of vaccination. I also find that all remaining SIRVA Table and QAI requirements are preponderantly met, as are all statutory requirements for entitlement. **Therefore, I find that Petitioner is entitled to compensation**.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master